IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID SEIPLE** | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| | : | |
| vs. | : | NO. 08-4201 |
| | : | |
| **FRIENDLY ICE CREAM** | : | |
| **CORPORATION, t/d/b/a "FRIENDLYS"** | : | |
| Defendant. | : | |

**DuBOIS, J.**                                                                                     **AUGUST 31, 2009**

**M E M O R A N D U M**

**I.     INTRODUCTION**

Plaintiff, David Seiple, initiated the instant lawsuit in response to his termination from his position as District Manager with Friendly Ice Cream Corporation. In his Complaint, plaintiff alleges that his termination was motivated by reverse sex discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII").

Presently before the Court is defendant's Motion for Summary Judgment. For the reasons that follow, the Court grants defendant's Motion for Summary Judgment and enters judgment in favor of defendant on the single claim—reverse sex discrimination—alleged in the Complaint.

**II.    BACKGROUND**

At all times relevant to this litigation, plaintiff, David Seiple, was District Manager with defendant Friendly Ice Cream Corporation ("Friendly's" or "defendant"), a position he obtained in September 2004. (Seiple Dep. 61:2–25, 83:2–14, Feb. 9, 2009, Ex. 1 to Pl.'s Resp.)  By January 2007, plaintiff was, as far as he knew, the highest-paid District Manager employed by Friendly's. (Id. at 105:13–16, 118:17–119:17; Gus DiGiovanni Dep. 70:16–71:17, Feb. 25, 2009, Ex. 4 to Pl.'s Resp.)  Plaintiff's supervisor, Gus DiGiovanni, the Regional Director for

plaintiff's district, mentioned to plaintiff that as he was a leading District Manager, more was expected of him, but plaintiff "never really took that to heart." (Seiple Dep. 105:17–106:9.) As a leading District Manager, plaintiff was responsible for ten restaurants, including the Fort Washington restaurant. (Id. at 266:7–15.)

On November 28, 2007, the Board of Health ("BOH") visited the Fort Washington restaurant for an inspection. (Id. at 144:4–145:7, 146:2–5.) The BOH identified problems with the restaurant's fountain area. (Id. at 146:19–24.) At that time, plaintiff was on vacation and was not present at the Fort Washington restaurant. (Id. at 144:4–8, 145:13–17.) The General Manager, Colleen Penot, was present during the BOH inspection. (Id. at 146:14–147:2.) As plaintiff was on vacation, Penot contacted Marie Kwiatkowski, the District Manager who was covering for plaintiff while he was away. (Id. 145:13–17, 146:21–147:12; Kwiatkowski Dep. 92:5–93:21, Feb. 25, 2009, Ex. 3 to Pl.'s Resp.) The parties dispute exactly what was required following the BOH inspection—whether the restaurant could be closed for just a few hours to clean the fountain area or whether a longer closure and more extensive cleaning were necessary. In any event, the parties agree that the BOH inspector told Penot to close the restaurant for at least a few hours to clean up the fountain area. (Seiple Dep. 153:25–154:17, 155:9–156:21; 157:18–159:11, 161:12–19; 162:21–163:7.) Kwiatkowski closed the restaurant for the rest of the day and scheduled a BOH reinspection for the following day. (Id. at 146:24–147:16, 155:9–157:9, 159:18–162:3.) That evening, Seiple returned from vacation and went to the Fort Washington restaurant to help clean. (Id. at 166:23–168:22.) The next day, November 29, 2007, the restaurant passed the BOH reinspection. (Id. at 169:24–170:6.)

On November 30, 2007, Lionel Bisson, an employee of defendant, conducted an

unannounced internal inspection of the Fort Washington restaurant; such inspections are known as "RJH inspections." (Id. at 171:6–174:6.) The following day, Bisson sent an email to plaintiff, DiGiovanni, and Donna Cummings, defendant's Manager of Quality Assurance. (Email from Bisson to Seiple, DiGiovanni, and Cummings, Dec. 1, 2007, Ex. G to Friendly Ice Cream Corporation's Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment ("Friendly's Statement of Undisputed Facts").) The email stated that "[t]he results [of the RJH inspection] were very disappointing. . . . Had I been the BOH, I would have closed this restaurant." (Id.) The email contained a two-page list of problems at the restaurant. (Id.)

The same day, December 1, 2007, DiGiovanni wrote an email to plaintiff regarding both the BOH inspection and Bisson's RJH inspection. (Seiple Dep. 177:7–180:13.) The email read as follows:

> Dave, I am really disappointed and concerned about Lionel's inspection. The restaurant was closed two days prior and we have made zero improvements in this restaurant after all the hard work everyone did to get this store re-opened. On Wednesday December 5, I would like to meet you at the store along with Jesse [Nieblas]. Dave, I need you to work in this store starting Monday for the entire week. I need you as the DM [District Manager] to show the management team how serious this situation is. What I need from you and the management team is a written game plan to fix and prevent this from ever happening again. A plan that covers daily, weekly and monthly.
>
> Dave what I need from you is your management team in this store. We can't operate with Shift Supervisors in this restaurant. I would advise you that you . . . do whatever you have to do in order to fix this once and for all. Look at your District and talk to me on Wednesday about your team in this store. The issues on Lionel's inspection are 100% daily operating procedures that are taken care of everyday. We need to submit to the Health department our action plan to improve and maintain.
>
> Dave, I can't stress enough how critical this situation is. Don't take this situation lightly. You need to utilize all your resources to fix this problem. Be prepared to discuss in detail you[r] plan.

(Email from DiGiovanni to Seiple, Dec. 1, 2007, Ex. J to Friendly's Statement of Undisputed

Facts.)

On December 5, 2007, plaintiff met with DiGiovanni, Bisson, and Human Resource Manager Jesse Nieblas at the Fort Washington restaurant. (Seiple Dep. 219:23–220:3.) Plaintiff was asked about "the history of everything that was going on in the [Fort Washington restaurant] . . . ." (Id. at 220:9–15.) They also discussed the pending termination of Penot, the Fort Washington General Manager, and other human resources issues. (Id. at 220:16–221:25.) The discussion was "[s]oup to nuts, Fort Washington." (Id. at 222:11.) Seiple presented two documents at the meeting—a "Restaurant Action Plan" dated November 30, 2007 and a "Quality Assurance Program Follow-Up Plan" dated November 15, 2007. (Id. at 225:7–253:12; Restaurant Action Plan, Nov. 30, 2007, Ex. H to Friendly's Statement of Undisputed Facts; Quality Assurance Follow-Up Plan, Nov. 15, 2007, Ex. 8 to Seiple Dep.) The Restaurant Action Plan was a one-page document listing five items to be corrected; plaintiff admitted at his deposition that this was not a formal, detailed, written plan. (Restaurant Action Plan; Seiple Dep. 306:16–307:10.) DiGiovanni, Bisson, and Nieblas all testified that plaintiff did not provide the kind of action plan that was requested or expected. (DiGiovanni Dep. 35:15–36:2, 37:1–7; Lionel Bisson Dep. 33:3–34:6, Feb. 25, 2009, Ex. D to Friendly's Statement of Undisputed Facts; Jesse Nieblas Dep. 14:11–17, Feb. 25, 2009, Ex. E to Friendly's Statement of Undisputed Facts.) DiGiovanni testified that "to be honest with you, we were just kind of baffled that day when we sat down and we met [plaintiff] and [plaintiff] had no action plan." (DiGiovanni Dep. 35:19–21.)

After the December 5, 2007 meeting, DiGiovanni decided to terminate plaintiff. (Id. at 4:22–5:13.) At a meeting on December 6, 2007, DiGiovanni terminated Penot and then

terminated plaintiff.  (Seiple Dep. 308:14–316:24.)  DiGiovanni testified that "the only reason why [plaintiff] was terminated was because he didn't have [an action] plan."  (DiGiovanni Dep. 30:12–13.)  DiGiovanni elaborated on the reason for plaintiff's termination as follows:

> I terminated [plaintiff] because of a failure to have an action plan to me in reference to what we were going to do in order to maintain that restaurant moving forward, after I personally met with the health inspector the day that we reopened, in which he [listed what he] was looking for, as far as weekly, monthly, et cetera.  That's why he was terminated.

(Id. at 57:2–9.)

### III.  PROCEDURAL HISTORY

On August 29, 2008, plaintiff filed a Complaint with a single cause of action—violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII").  Plaintiff alleged that "[i]n terminating [p]laintiff, a male, while retaining Ms. Kwiat[k]owski (a female) under the same or similar circumstances, [d]efendant subjected [p]laintiff to disparate treatment because of his sex (male) and/or terminated his employment because of his sex."  (Compl. ¶ 23.)  This Court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

On March 13, 2009, defendant filed the instant Motion for Summary Judgment.  In the motion, defendant seeks entry of judgment in its favor on the single claim—reverse sex discrimination—asserted by plaintiff.

### IV.  LEGAL STANDARD

A court should grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  A factual dispute is material when it "might

affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007) (citations omitted); accord Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982) (citations omitted). The nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

**V.    DISCUSSION**

Plaintiff argues that his claim of reverse sex discrimination survives summary judgment under both the familiar pretext theory of McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973), and the mixed motive theory of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), modified on other grounds by the Civil Rights Act of 1991. This Memorandum will address each theory in turn.

    **A.    Title VII—Pretext Theory**

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

For claims of employment discrimination on the basis of sex, the familiar framework established by the Supreme Court in <u>McDonnell Douglas Corporation v. Green</u>, 411 U.S. 792, 802 (1973), applies.  The Supreme Court further explained this framework in <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 252–53 (1981) (internal quotation marks & citations omitted):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination.  Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

### 1. *Prima Facie* Case of Discrimination

In suits challenging adverse employment actions, to prove a *prima facie* case of discrimination, a plaintiff must establish by a preponderance of the evidence that:  (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for his position; (3) plaintiff suffered an adverse employment action; and (4) the circumstances of his discharge permit an inference of unlawful discrimination.  <u>Makky v. Chertoff</u>, 541 F.3d 205, 214 (3d Cir. 2008).  "The burden of establishing a prima facie case of disparate treatment is not onerous."  <u>Burdine</u>, 450 U.S. at 253. Nevertheless, "[t]he prima facie case serves an important function in the litigation:  it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection [or termination]."  <u>Id.</u> at 253–54 (citation omitted).

Reverse discrimination suits, such as allegations of sex discrimination against men, "require the Court to apply a modified burden-shifting analysis that differs slights from the <u>McDonnell-Douglas</u> test."  <u>Chiaradonna v. Rosemont Coll.</u>, No. 06-CV-1015, 2008 WL 282253,

at *3 (E.D. Pa. Jan. 31, 2008) (citing Iadimarco v. Runyon, 190 F.3d 151, 157–58 (3d Cir. 1999)).  To establish a *prima facie* case in the context of reverse discrimination, the plaintiff "must present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." Iadimarco, 190 F.3d at 161.  Once a plaintiff establishes such a *prima facie* case, the remainder of the burden-shifting framework of McDonnell-Douglas applies.  Id. at 165–67.

      Plaintiff argues that his termination was discriminatory because he was treated less favorably than a similarly situated female colleague, Marie Kwiatkowski.  (Pl.'s Resp. 5–7.)  In particular, plaintiff contends that he and Kwiatkowski held the same position, District Manager, and engaged in the same conduct but that he was terminated for such conduct while she was not.  (Id. at 4–6.)  He further argues that Gus DiGiovanni had supervisory authority over both himself and Kwiatkowski, rendering them similarly situated.  (Id. at 6–7.)

      "Common circumstances giving rise to an inference of unlawful discrimination include . . . the more favorable treatment of similarly situated colleagues outside of the relevant class." Morris v. G.E. Fin. Assurance Holdings, No. 00-CV-3849, 2001 WL 1558039, at *5 (E.D. Pa. Dec. 3, 2001) (citing Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999)).  "To be deemed similarly situated the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Bullock, 71 F. Supp. 2d at 489 (internal quotation marks & citations omitted).  In other words, a plaintiff "must establish that the other employee's acts were of comparable seriousness to his own infraction." Anderson v. Haverford Coll., 868 F. Supp. 741, 745 (E.D. Pa. 1994) (internal

quotation marks & citations omitted). Moreover, similarly situated individuals "'must have dealt with the same supervisor [and] have been subject to the same standards . . . .'" Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002) (quoting Morris, 2001 WL 1558039, at *6). The similarly situated analysis must take into account the particular circumstances of the alleged discriminatory act. "In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir. 1998) (citing Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1992)).

The aforementioned authority makes clear that plaintiff and Kwiatkowski are not similarly situated. Plaintiff argues that he is similarly situated to Kwiatkowski because they both experienced a restaurant closure in their respective districts following a BOH inspection—for plaintiff, the Fort Washington restaurant in November 2007; for Kwiatkowski, the Doylestown restaurant in August 2006. (Pl.'s Resp. 5–6.) Plaintiff further argues that Kwiatkowski was involved in two additional restaurant closures—one at the Fort Washington restaurant in 2006 and the Fort Washington November 2007 closure, as she was covering for plaintiff when he was on vacation. (Id.) Plaintiff relies on the fact of closure, but in the similarly situated analysis, "the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." Simpson, 142 F.3d at 647 (citation omitted). DiGiovanni testified that plaintiff was not terminated simply because the Fort Washington restaurant was closed following a BOH inspection; instead, "the only reason why [plaintiff] was terminated was because he didn't have

9

[an action] plan." (DiGiovanni Dep. 30:12–13.) DiGiovanni further explained the reason for plaintiff's termination:

> I terminated [plaintiff] because of a failure to have an action plan to me in reference to what we were going to do in order to maintain that restaurant moving forward, after I personally met with the health inspector the day that we reopened, in which he [listed what he] was looking for, as far as weekly, monthly, et cetera. That's why he was terminated.

(Id. at 57:2–9.)

In particular, on December 1, 2007, DiGiovanni sent an email to plaintiff stating that he was "disappointed and concerned"about the results of the inspections and scheduling a meeting for December 5, 2007. (Email from DiGiovanni to Seiple.) DiGiovanni instructed plaintiff to prepare "a written game plan to fix and prevent this from ever happening again. A plan that covers daily, weekly and monthly." (Id.) He cautioned plaintiff as follows: "I can't stress enough how critical this situation is. Don't take this situation lightly. You need to utilize all your resources to fix this problem. Be prepared to discuss in detail you[r] plan." (Id.) On December 5, 2007, plaintiff met with DiGiovanni; Lionel Bisson; and Jesse Nieblas, Human Resources Manager. (Seiple Dep. 219:23–220:3.) Plaintiff brought a document entitled "Restaurant Action Plan" to the meeting, but plaintiff testified that this document was not a formal, detailed, written plan. (Id. at 242:12–23, 306:2–307:10; see also Restaurant Action Plan.) DiGiovanni, Bisson, and Nieblas all testified that plaintiff did not provide the kind of plan that was requested or expected. (DiGiovanni Dep. 35:15–36:2, 37:1–7; Bisson Dep. 33:3–34:6; Nieblas Dep. 14:11–17.)

There is no evidence in the record that Kwiatkowski similarly failed to provide an action plan following the closure of one of her restaurants. Bisson in fact testified that Kwiatkowski put

together an action plan in response to the August 2006 Doylestown closure.  (Bisson Dep. 48:8–22.)

Plaintiff and Kwiatkowski may be deemed similarly situated only if they "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it," and they did not.  <u>Bullock</u>, 71 F. Supp. 2d at 489 (internal quotation marks & citations omitted).  While both plaintiff and Kwiatkowski experienced restaurant closures in their districts, plaintiff's failure to provide an action plan in response differentiates the closure of his restaurant from those of Kwiatkowski.  This lack of an action plan rendered his infraction more serious than the closures experienced by Kwiatkowski.  <u>See</u> <u>Anderson</u>, 868 F. Supp. at 745.  In fact, plaintiff was terminated for failing to draw up an action plan following the closure, not for the closure itself.  There is no evidence that Kwiatkowski ever acted comparably by failing to respond to a request for an action plan.  As plaintiff and Kwiatkowski did not engage in similar conduct, they are not similarly situated for purposes of Title VII.

Moreover, at the respective times when their restaurants were closed following a BOH inspection, plaintiff and Kwiatkowski had different direct supervisors.  In November 2007, when plaintiff's Fort Washington restaurant was closed, plaintiff's direct supervisor was DiGiovanni, the Regional Manager for plaintiff's district.  (Seiple Dep. 62:3–63:10, 206:24–207:6.)  DiGiovanni made the decision to terminate plaintiff.  (DiGiovanni Dep. 4:22–5:13.)  In August 2006, when Kwiatkowski's Doylestown restaurant was closed, Kwiatkowski was supervised by Brian Dragone, the Regional Manager in charge of Kwiatkowski's district.  (Kwiatkowski Dep. 82:20–24; DiGiovanni Dep. 44:5–23.)  DiGiovanni was a Division Vice President at that time

and was informed of the Doylestown closure by Dragone.  (DiGiovanni Dep. 44:17–45:13.)  The decision regarding how to discipline Kwiatkowski, however, was made by Dragone, and DiGiovanni had no control over that decision.  (Id. at 44:24–45:4.)  For employees to be deemed similarly situated, they "'must have dealt with the same supervisor . . . .'"  Ogden, 226 F. Supp. 2d at 603 (quoting Morris, 2001 WL 1558039, at *6).  Plaintiff and Kwiatkowski did not deal with the same supervisor at the relevant times; thus, the decision to terminate plaintiff and not to terminate Kwiatkowski were made by different individuals.

   Another factor rendering Kwiatkowski differently situated from plaintiff is that she and plaintiff were subject to different standards.  Kwiatkowski was promoted to District Manager in October 2005, approximately ten months before the Doylestown closure.  (Kwiatkowski Dep. 42:11–13.)  Plaintiff himself testified that newly promoted employees are given some leeway and that their mistakes are treated as "more of a learning tool for them to grow in their position to get better."  (Seiple Dep. 109:9–15.)  Seiple, on the other hand, was promoted to District Manager in September 2004, more than three years before the Fort Washington closure.  (Id. at 83:2–15.)  By the time of the Fort Washington closure, plaintiff was, as far as he knew, the highest-paid District Manager.  (Id. at 105:13–16, 118:17–119:17; DiGiovanni Dep. 70:16–71:17.)  DiGiovanni mentioned to plaintiff that as he was a leading District Manager, more was expected of him, but plaintiff "never really took that to heart."  (Seiple Dep. 105:17–106:9.)  Accordingly, plaintiff and Kwiatkowski had significantly different amounts of experience as District Manager at the time of their respective store closures.  When those closures were reviewed, plaintiff and Kwiatkowski were subject to different standards and different performance expectations.  Such differences mitigate against deeming them similarly situated.  See Ogden, 226 F. Supp. 2d at 603.

After careful review of the record on summary judgment, the Court concludes that plaintiff has not presented evidence that he was treated less favorably than a similarly situated female employee. Thus, because plaintiff cannot make out a *prima facie* case, his claim of reverse discrimination fails under the pretext theory.

### 2. Defendant's Legitimate, Non-Discriminatory Reason for Termination

Assuming *arguendo* that plaintiff has established a *prima facie* case, defendant then has the burden of producing a legitimate, non-discriminatory explanation for its decision to terminate plaintiff. Burdine, 450 U.S. at 253 (internal quotation marks & citations omitted). The Court concludes that defendant has articulated such a reason in this case—namely, that plaintiff failed to produce an action plan in response to his supervisor's request. Accordingly, the burden shifts back to plaintiff to demonstrate that defendant's proffered explanation for the adverse employment action is a pretext for discrimination.

### 3. Pretext

To prove pretext, plaintiff can either: (1) present evidence that "'casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication,'" or (2) present evidence that "'allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" Akinson v. Lafayette Coll., 460 F.3d 447, 454 (3d Cir. 2006) (quoting Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994)). "[T]he non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer

13

did not act for [the asserted] non-discriminatory reasons.'" Fuentes, 32 F.3d at 765 (emphasis in original) (internal citations omitted).

Plaintiff contends that defendant's proffered reason for his termination is only pretextual and presents three arguments in support of this contention: (1) DiGiovanni's testimony on whether plaintiff presented an action plan is equivocal; (2) DiGiovanni made inconsistent statements with respect to the time that he decided to fire the General Manager at the Fort Washington restaurant, Colleen Penot, calling DiGiovanni's credibility into question; and (3) Kwiatkowski overstated the problems with the Fort Washington restaurant to DiGiovanni and closed it unnecessarily. (Pl.'s Resp. 10–11.)

Plaintiff bases his argument that DiGiovanni's testimony on whether plaintiff presented an action plan is equivocal on the following passage in DiGiovanni's deposition testimony: "[Plaintiff] gave me an action plan—actually, he didn't have an action plan." (DiGiovanni Dep. 37:3–4.) The first part of this statement appears to be a slip of the tongue rather than a true equivocation regarding whether plaintiff presented a satisfactory action plan at the meeting on December 5, 2007. DiGiovanni stated at least five other times during his deposition that plaintiff did not present an adequate action plan at the December 5, 2007 meeting. (DiGiovanni Dep. 30:12–13, 35:19–21, 37:6–7, 57:2–9, 66:10–24.) Bisson and Nieblas, who were present at the December 5, 2007 meeting, also testified that plaintiff did not bring a satisfactory action plan to that meeting. (Bisson Dep. 33:3–34:6; Nieblas Dep. 14:11–17.) In light of all of the other testimony confirming that plaintiff did not present an adequate action plan, DiGiovanni's slip of the tongue does not suffice to prove that defendant's reason for terminating plaintiff was merely a pretext for discrimination.

Plaintiff focuses on an inconsistency in DiGiovanni's testimony regarding the time at which he decided to fire Penot. The timing of DiGiovanni's decision with respect to Penot does not bear on the reason for plaintiff's termination. Moreover, any such inconsistency is not of enough significance to make defendant's legitimate reason for plaintiff's termination "unworthy of credence." Fuentes, 32 F.3d at 765.

Plaintiff further argues that Kwiatkowski, in reporting to DiGiovanni about the closure, overstated the problems with the Fort Washington restaurant. Moreover, according to plaintiff, Kwiatkowski closed the restaurant for longer than was necessary to address the issues raised by the BOH. Assuming *arguendo* the truth of these statements, they do not suffice to prove pretext. The inquiry at the pretext stage is "not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (internal quotation marks & citation omitted). Even if DiGiovanni based his decision to terminate plaintiff on inaccurate information, this does not prove pretext. "To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765 (citations omitted).

The Court concludes that none of the inconsistencies identified by plaintiff "casts sufficient doubt upon . . . the legitimate reason[] proffered by the defendant so that a factfinder could reasonably conclude that [the] reason was a fabrication." Fuentes, 32 F.3d at 762. Accordingly, plaintiff has failed to prove that defendant's legitimate reason for his termination was, in actuality, a pretext for discrimination. Plaintiff's claim of reverse sex discrimination fails

under the pretext theory.

      **B.**       **Title VII—Mixed Motive Theory**

Plaintiff argues that he can establish a claim of reverse sex discrimination under the "mixed motive" framework of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), modified on other grounds by the Civil Rights Act of 1991. (Pl.'s Resp. 8.) In a mixed motive discrimination case, "both legitimate and illegitimate reasons motivated" the employment decision. Desert Palace, Inc. v. Costa, 539 U.S. 90, 93 (2003). Title VII, as amended by the Civil Rights Act of 1991, provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). In Desert Palace, the Supreme Court held that a plaintiff could satisfy his initial burden in a mixed motive case by "present[ing] sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" 539 U.S. at 101 (quoting § 2000e-2(m)). Such evidence that the employer relied in part on an impermissible factor may be direct or circumstantial. Id. at 99–101.

Plaintiff has not presented any direct or circumstantial evidence that would allow a reasonable jury to conclude, by a preponderance of the evidence, that sex was a motivating factor in defendant's decision to terminate plaintiff's employment. See Desert Palace, 539 U.S. at 101. Plaintiff testified that the only basis for his reverse discrimination claim was that a female employee—Kwiatkowski—was treated more favorably than he was treated. (Seiple Dep. 335:11–337:4.) As discussed in Part V.A.1, *supra*, defendant and Kwiatkowski are not similarly

16

situated; thus, evidence of differential treatment does not support plaintiff's claim that sex was a motivating factor in his termination.  Plaintiff has presented no other evidence of discrimination based on sex  Accordingly, plaintiff has not met his initial burden, and his claim of reverse discrimination fails under the mixed motive theory.

## VI.     CONCLUSION

For all of the foregoing reasons, the Court grants defendant's Motion for Summary Judgment and enters judgment for defendant on the sole cause of action—violation of Title VII of the Civil Rights Act of 1964.